UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff )<br>)<br>V. )<br>)<br>)<br>ROY LACY COBB, )<br>Defendant )<br>) | Criminal No. 08-111-GFVT<br><br>**MEMORANDUM OPINION**<br>**&**<br>**ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Before the Court are (1) Magistrate Judge Edward B. Atkins's Report and Recommendation and (2) Defendant Roy Lacy Cobb's associated Motion to Vacate, Motion for Recusal, Appointment of Counsel, and an Evidentiary Hearing, Motions for Production of Documents, and Motions to Supplement his Motion to Vacate. [R. 106, 122, 130, 131, 133, 134, 136, 141, 142, 143, and 148.] For the reasons explained below, the Court will ADOPT the remaining recommendations in the Magistrate's report and DENY all of the outstanding relief sought in Cobb's motions.

**I**

On February 23, 2009, a jury found Cobb guilty of distributing oxycodone. [R. 67.] This Court then sentenced him to 300 months in prison.[1] [R. 82.] The Court granted an upward departure from Cobb's sentencing guideline range due to evidence that he (1) provided oxycodone to at least ten young women in exchange for sex and (2) possessed a firearm during some of the transactions in question. [R. 98, 105-12.] Cobb then filed a spate of motions and

---

[1] The Court later reduced that sentence to 240 months pursuant to 18 U.S.C. § 3582(c)(2). [R. 151 at 1.]

appeals, some of which have already been resolved by this Court or the Sixth Circuit. The Magistrate reviewed Cobb's remaining motions on February 10, 2014, including thirty-five claims of ineffective assistance of counsel. [R. 143.] Judge Atkins eventually found that the allegations in Cobb's Motion to Vacate were meritless, and recommended denial of both his § 2255 petition and all associated motions. [*Id.* at 39.]

On January 8, 2016, the Court declined to adopt the Magistrate's recommendation about (1) Cobb's motion for appointment of counsel and (2) his request for an evidentiary hearing. [R. 152.] Specifically, the Court determined that Cobb had raised a "credible factual dispute" about (1) the reasonableness of trial counsel's investigation into his previous mental health diagnoses, (2) the steps taken by counsel to authenticate alleged audio tapes that Cobb felt would aid in his defense, and (3) counsel's alleged failure to attend Cobb's presentence interview. [*Id.* at 2-8.] The Court thus found that these claims "warranted further exposition at an evidentiary hearing." [*Id.* at 6.] But the Court did "not reach any of the remaining findings in the Magistrate's report," and drew "no conclusions" about "the balance of the recommendations contained therein." [R. 152 at 9.]

The parties convened for an evidentiary hearing on July 8, 2016, and presented substantial testimony related to each of the three claims noted above. [R. 192.] These issues, plus the remaining recommendations of the Magistrate, are now ripe for review.

## II

### A

Under Fed. R. Civ. P. 72(b)(2), a petitioner has fourteen days from the date of service to register his objections to a magistrate's recommendation. To receive a *de novo* review by this Court, any objection to the recommended disposition must be specific. *Mira v. Marshall*, 806

F.2d 636, 637 (6th Cir. 1986). A specific objection "explain[s] and cite[s] specific portions of the report which [counsel] deem[s] problematic." *Robert v. Tesson*, 507 F.3d. 981, 994 (6th Cir. 2007) (quoting *Smith v. Chater*, 121 F.3d 709, 1997 WL 415309, at *2 (6th Cir. 1997) (unpublished opinion)). A general objection that does not identify specific issues from the magistrate's report is not permitted because it renders the recommendations of the magistrate useless, duplicates the efforts of the magistrate, and wastes judicial economy. *Howard v. Secretary of Health and Human Services*, 932 F.2d 505, 509 (6th Cir. 1991).

**B**

**i**

Rather than enumerate specific objections to the Magistrate's report, Cobb has filed a sprawling maze of duplicative arguments, fact statements, and general grievances.[2] [R. 145, 147.] The Court has undertaken a good-faith effort to identify those specific objections embedded in these filings.[3] After careful review, the Court has located eight claims that arguably qualify as specific objections to the Magistrate's report. Three of these objections involve the issues raised at the evidentiary hearing, and the Court will address those separately.

---

[2] Cobb also attempts to "object to the Magistrate Judge's Report and Recommendations completely." [R. 145 at 1.] That is not a specific objection, and the Court will ignore it.

[3] Although Cobb has submitted two separate filings styled as "objections" to the Magistrate's report, only one of these fell within the time period for objections approved by the Court. Shortly after the Magistrate filed his recommendation, Cobb submitted a motion for an extension of time to file his objections. [R. 144.] When he did not receive an immediate response to that motion, he filed his first list of objections on March 6, 2014. [R. 145.] A few days later, the Magistrate issued an order approving Cobb's motion for an extension of time. [R. 146.] A review of this order indicates that the Magistrate likely intended to permit only the untimely objections that Cobb had already filed. [*Id.* at 1.] But Cobb apparently misunderstood the Magistrate's order as granting an *additional* extension of time to file objections. He then submitted another filing styled as "objections" to the Magistrate's report. [R. 147.] Many of these objections were identical to those previously filed, although Cobb also added several new facts and claims. By filing these objections well after the fourteen-day time period had passed, Cobb probably waived his right to receive a *de novo* review by this Court. But given (1) the slight ambiguity of the Magistrate's order and (2) the substantial overlap of issues in both lists of objections, the Court will consider all of the specific objections contained in each of these filings.

3

The five remaining objections can be resolved easily, and the Court will address those at the outset.

First, Cobb briefly accuses the Magistrate of failing to address all of his arguments. He claims that Judge Atkins left "parts of" his § 2255 petition "unresponded [sic]," disregarded some of the issues raised in his supplements to that motion, and "cut" his thirty-five claims of ineffective assistance of counsel "down to (10) ten." [R. 145 at 4, R. 147 at 3.] The Court begins by noting that, in the wake of his conviction, Cobb has filed almost four hundred pages of arguments, stories, tangents, accusations, and other materials. [R. 106, 108, 120, 121, 122, 127, 130, 131, 132, 133, 134, 135, 136, 141, 142, 145, 147, 148.] Many of these facts and claims appear for the first time in the eighth, ninth, or tenth filing submitted by Cobb after his original motion to vacate. Most are merely supplements to arguments previously raised, and almost all are unsupported and/or facially contradicted by the record and the relevant case law.

Both the Magistrate and this Court have made every effort to identify those claims that are actually specific and clear enough to warrant a response. But the Magistrate was not required to wade through Cobb's morass of tangents and ambiguous declarations in an effort to cobble together a list of coherent arguments. *See, e.g., Treesh v. Bagley*, 612 F.3d 424, 434 (6th Cir. 2010) (finding habeas petitioner had waived claims by making vague, unsupported factual assertions and failing to "develop[ ] a legal argument."). And in order to structure our orders efficiently and clearly, we have also attempted to consolidate many of Cobb's redundant claims into overarching categories. The Magistrate did not, for example, ignore twenty-five of Cobb's thirty-five ineffective assistance of counsel claims. Instead, he recognized that the "thirty five (35) bullet points in [Cobb's] memorandum" could be "properly summarized" under ten headings. [R. 143 at 3.]

4

The only specific claim that Cobb faults the Magistrate for not addressing is his allegation of "police perjury." [R. 145 at 7.] Cobb has repeatedly argued that a search warrant giving investigators access to his camper was illegal. [R. 121 at 1.] In one of the many supplements to his motion to vacate, Cobb attempts to tie this claim to a broad allegation of "police perjury." [R. 142 at 2.] He apparently argues that a police investigator "defrauded the justice system" by lying in this search warrant. [*Id.* at 2.] He then cites one of his previous motions to amend, which also complains about the execution of that search warrant. [*Id.*] This amended motion accuses the investigator of committing "burglary" by "breaking and entering" his camper at night, though it is unclear if he believes this accusation somehow relates to his claim of perjury. [R. 121 at 1-2.] The motion also contains some ambiguous discussion of his family history, an unfounded accusation that investigators threatened witnesses in his case, and some general attempts to re-litigate the facts supporting his conviction.[4] [*Id.* at 1-8.] To the extent that the Magistrate failed to address this claim specifically, the Court finds that Cobb's allegation of "police perjury" is facially inadequate to warrant relief of any kind.

Second, Cobb objects to the Magistrate's discussion of his "right" to appear at a variety of pretrial hearings, including a *Wade* hearing. Cobb argues that his trial counsel rendered ineffective assistance by "depriv[ing] him of his right to any pretrial hearings." [R. 143 at 20.] To stage a successful ineffective assistance of counsel claim, Cobb must satisfy a two-part test. First, he must show that his attorney's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). This standard carries "a strong presumption that counsel's conduct falls within the wide range of reasonable professional

---

[4] The only claim that potentially relates to his "police perjury" allegation appears in his discussion of alleged audio recordings of certain witnesses. [R. 121 at 3.] The parties thoroughly addressed the subject of these supposed audio tapes at the evidentiary hearing, and the Court will address that claim separately below.

5

assistance." *Id*. at 689. And even if he demonstrates that counsel's acts or omissions were objectively unreasonable, Cobb must also demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id.*

Here, Cobb argues that his counsel should have demanded a *Wade* hearing to determine "the identity of the individuals" in a photograph introduced at trial that depicts a sexual act between Cobb and a young woman. [*Id.*] But the Magistrate noted that Cobb did not have an "automatic right to any pretrial hearing based on the admissibility of evidence," and that he must first prove he was "entitled to such a hearing" before advancing this claim.[5] The Magistrate explained, for example, that a *Wade* hearing relates only "to lineup identifications where the defendant's counsel was not present, and has no relevance to Cobb's claims regarding the identity of the person in the photograph." [*Id.* at 21.]; *see also United States v. Wade,* 388 U.S. 218, 240-41 (1967). Cobb has altogether failed to demonstrate his entitlement to these hearings. And even if he could provide facts plausibly supporting the propriety of holding them, he has certainly failed to show that (1) counsel's decision not to request these hearings was objectively unreasonable and (2) this decision prejudiced the outcome of his trial.

Third, Cobb challenges the Magistrate's evaluation of his appellate counsel's performance. His sole grounds for this objection is that his counsel only agreed to argue "3 issues" on appeal, and that Cobb then "told him he was fired and sent the appeals court a letter explaining the issue between us." [R. 145 at 5.] That may be an accurate description of what happened, but it is plainly insufficient to support a claim of ineffective assistance.

---

[5] The Magistrate also noted that "the record shows" counsel did in fact "file[ ] multiple motions *in limine*" in the run-up to trial. [R. 143 at 20.]

Fourth, Cobb objects to the Magistrate's rejection of his claim that trial counsel should have disputed the validity of the search warrant for his camper. [R. 145 at 1.] For this argument to succeed, Cobb must show that "his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). Here, the Magistrate properly concluded that "Cobb's search warrant was supported by probable cause." [R. 143 at 16.] He noted that investigators relied upon "statements of Mary Cobb that Cobb conducted drug trafficking from the trailer, that she received OxyContin from Cobb at the trailer, and that she had witnessed other women at the trailer and believed that they were present at the trailer to receive OxyContin from Cobb." [*Id.*] (citing R. 18). Investigators corroborated this evidence with "the statements of several different informants along with recorded phone calls." [*Id.*] The warrant also plainly satisfied the particularity requirement by describing Cobb's trailer as a "white pull behind camper" and listing the trailer's serial number. [*Id.*] And as a "deputized" member of the Drug Enforcement Agency, the detective leading the investigation also had jurisdiction to search the camper. [*Id.* at 17.] None of these facts implicate any Fourth Amendment concerns. Counsel's decision not to object to this search was reasonable, and his failure to do so did not prejudice the outcome of Cobb's trial.

Fifth, Cobb objects to the Magistrate's recommended denial of his Motion for Recusal. Cobb claims, without supporting evidence, that an Assistant United States Attorney who prosecuted his case was "formerly the U.S. Probationer for [his] daughter" and that he "transferred himself to the office of U.S. Attorney" for the sole purpose of prosecuting him. [R. 122.] This prosecutor responds that, while he was a probation officer during the time Mary Cobb was under the supervision of the Probation Office, he had "no contact" with her and "no

7

involvement" in her case. [R. 124 at 8.] Cobb has provided no evidence to refute this statement. And courts will "presume" that prosecutors "have properly discharged their duties" absent "clear evidence to the contrary." *United States v. Armstrong*, 517 U.S. 456, 464 (1996). This claim fails.

### ii

The Court carefully addressed Cobb's remaining three objections at the evidentiary hearing. The first of these concerned Cobb's allegation that he "obtained several tape recordings from the witnesses in this matter" in which "the witnesses recant[ed] their testimony and admit[ted] they committed perjury and they were forced to commit perjury by [detectives in the case.]" [R. 106-1 at 37.] He claims that his trial counsel rendered ineffective assistance by failing to introduce these tapes into evidence. In an affidavit submitted by the Government, Cobb's counsel stated that the tapes "could not be authenticated" and, "therefore, there was not a basis for admission [of them] into evidence." [R. 124-1 at 3.] Although the Magistrate recommended denying this claim without an evidentiary hearing, the Court determined that the record was "insufficient to establish (1) whether such tapes exist[ed], (2) what evidence these tapes contain[ed], and (3) the reasonableness of the steps taken by [counsel] to examine and authenticate the tapes." [R. 152 at 6.]

At the evidentiary hearing, Cobb's sister claimed that Cobb told her to give Gordon "two cassette tapes" in advance of trial. [R. 196 at 13.] When asked "what was on them," she simply said that they recorded Cobb "having a conversation" with two witnesses. [*Id.* at 14.] She otherwise said "[t]here was stuff on them but I don't, I just remember Savanna was on one and Paige was on the other because I had them . . . marked." [*Id.*] She also said that she might have given Gordon a cell phone recording of Cobb speaking to another man, but did not indicate

8

whether this recording contained any exculpatory information. [*Id.* at 14-15.] Later on, however, she did suggest that Cobb felt the content of these recordings would "[h]elp him out with [his] charges." [*Id.* at 19.] She otherwise could not recall anything that Gordon said to her about the tapes. [*Id.*] In his own testimony, Cobb claimed that he had talked to Gordon about the tapes and Gordon "said he was going to use the tapes at trial." [*Id.* at 64.] He also suggested that he told his sister to provide Gordon with his cell phone. [*Id.* at 65.]

For his part, Gordon recalls only that he and Cobb had "a conversation . . . about some tapes," but "can't remember ever being provided those tapes." [*Id.* at 34.] And because he could never obtain "the tapes to authenticate 'em," he could not introduce them at trial. [*Id.* at 35.] He also testified that he "never had" Cobb's cell phone or any recordings from it. [*Id.*] The United States also pointed out that, during Cobb's trial, the prosecutor "stood up and showed witnesses a cell phone that he reported to be Mr. Cobb's." [*Id.* at 35-36.] Because the "phone was shown by [the United States]" at trial, Gordon stated that he could not have possessed it at that time. [*Id.* at 36.] He also added that, if he had received any recording that he believed "might have been beneficial to [Cobb]," he "would have at least explored it to . . . make a determination if it was going to be something that I would introduce." [*Id.* at 53.]

Cobb's counsel admitted that she did not "know where the tapes are." [*Id.* at 63.] She also said that she had "received a tape from the Cobb family," but that it was clearly not one of "the tapes that are in question because [she and Cobb] discussed the tape that [she had]." [*Id.*] By the end of the evidentiary hearing, then, Cobb had failed to establish whether these tapes even existed. And even if he had established that they existed, he also failed to show (1) that Gordon ever received these tapes, (2) that Gordon's decision not to introduce these tapes, if he did in fact receive them, was objectively unreasonable, or (3) that this decision prejudiced the outcome of

9

his trial. Cobb has thus failed to demonstrate that Gordon's actions were objectively unreasonable, much less that these actions influenced the jury's verdict.

Cobb's next allegation is that Gordon "failed to attend [his] presentence interview" with the Probation Office. [R. 147 at 6-7.] At the evidentiary hearing, the probation officer in charge of Cobb's case, Richard D. Mills, testified that he "really [couldn't] remember" whether Gordon attended the interview. [R. 196 at 6.] He stated that, on occasions where an attorney did not attend this interview, he "wouldn't discuss the offense with the defendant" or ask about "their criminal history." [*Id.* at 7.] Cobb's counsel then asked Mills how "the absence of counsel" in an interview might affect the defendant's "guideline calculation," to which Mills responded, "[t]o tell you the truth, I really don't think it does." [*Id.* at 9.]

In his own testimony, Gordon stated that he could not "specifically remember" if he was present at the interview. He emphasized, however, that he had "never, ever . . . failed to show up for a presentence investigation report." [*Id.* at 37.] And he added that he would "not necessarily sit in for the entire interview, but in terms of what [he] considered to be the very important parts, the acceptance of responsibility, criminal history, those kind of things, [he was] always there." [*Id.*] Cobb's counsel then handed Gordon a letter in an effort to "refresh his memory." [*Id.* at 39.] The letter was apparently from Gordon to Cobb and indicated that Gordon "was late" to the interview because he "thought maybe [the interview] was in Lexington, so [he] had to run to London," where the interview actually took place. [*Id.*]

These facts are plainly inadequate to support a claim of ineffective assistance. At best, the evidence suggests that Gordon may have been late to Cobb's interview due to a misunderstanding about its location. Cobb has not demonstrated that Gordon was absent for any significant portion of the interview, nor has he provided any facts to refute Mills's testimony that

10

he "really [didn't] think" Gordon's absence would have affected the preparation of the PSR. And if Cobb had objected to any aspect of Mills's report, both he and Gordon had ample opportunity to register those objections with the Court. The record establishes that he and Gordon did file objections to this report, and the Court fully considered those at sentencing.[6] And the only errors in the PSR now cited by Cobb—including a failure to mention the names of certain family members, a missing reference to his GED, and an inaccurate mailing address for his sister—are far too minor to support an ineffective assistance claim.[7] On these facts, there is simply no evidence that Gordon's conduct had any impact on the outcome of Cobb's sentencing.

Cobb's final claim requires more careful attention. He argues "that he was mentally disabled during his trial and sentencing and that counsel was ineffective for failing to investigate his mental competency." [R. 143 at 23.] Following his indictment, Cobb's bond report provided the following account of his mental health history:

> The defendant reported that he has been receiving Social Security disability since 2004 […]. Debra Cobb reported that the defendant receives disability due to his mental health status.
>
> […]
>
> Cobb reported suffering from severe panic attacks. The defendant stated that he was diagnosed with schizophrenia and bipolar disorder in approximately 2003. He acknowledged receiving treatment through his family physician, Dr. Atenza. According to Debra Cobb, she believes the defendant suffers from depression.
>
> She noted that in approximately 2002, he was admitted into the VA Hospital in Lexington, Kentucky, for four days due to having suicidal thoughts. Debra Cobb indicated that the defendant has not expressed any suicidal tendencies since that time.

---

[6] Gordon testified that Cobb "prepared his own objections" to the PSR, but that Gordon also filed his own objections on Cobb's behalf. [R. 196 at 40.] He also stated that, if there had been "anything in [the PSR] that . . . [he] didn't expect," he "simply would have filed the appropriate objection." [Id.] A review of the PSR shows that both Cobb and Gordon filed objections to the PSR. [PSR at 33-48.] The mere fact that Cobb chose to file his own objections in addition to Gordon's is facially insufficient to demonstrate ineffective assistance.

[7] Cobb also claims that the PSR fails to mention his "medical conditions," which is not true. [*See* PSR at 18-19.]

11

[Bond Report at 2-3.]

In response to Cobb's claims about his mental health status, Gordon initially submitted an affidavit stating that he had "never observed any behavior from Cobb that provided an indication that he was suffering from a mental disease." [R. 124-1 at 1.] He likewise suggested that he was "never provided documentation or told by anyone associated with Mr. Cobb that he suffered from a mental handicap that called into question either his competence to stand trial or his sanity at the time of the offense." [*Id.* at 1.] The Magistrate found this explanation sufficient, concluding that "counsel was presented no evidence that would have led a reasonable attorney to investigate Cobb's competence." [R. 143 at 24.] But the Court, citing the alleged record of disability noted above, held that an evidentiary hearing was necessary "to determine (1) Gordon's awareness of any information regarding Cobb's mental health status at each stage of this case, (2) the reasonableness of the efforts made by Gordon to obtain or follow up on this information, and (3) the credibility of Cobb's claims regarding his mental health." [R. 152 at 5-6.]

As a preliminary matter, the Court notes that no testimony or evidence presented at the evidentiary hearing addressed "the credibility of Cobb's claims regarding his mental health." [*Id.*] Even after receiving court-appointed counsel and a hearing, Cobb has still failed to provide expert or documentary proof of his prior mental health diagnoses. All of his alleged mental health issues remain self-reported. The Court could likely dismiss his claims on that basis alone. But in an abundance of caution, the Court will assume, for the purposes of the discussion below, that Cobb's reported mental health diagnoses are real.

When an attorney receives "indicia of incompetence that would provide reasonable counsel 'reason to doubt' the defendant's" competency to stand trial, he may render ineffective

12

assistance by failing to investigate his client's competency further. *Jermyn v. Horn*, 266 F.3d 257, 300 (3d Cir. 2001) (citations omitted). But "the bar for incompetency is high: a criminal defendant must lack either a 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' or 'a rational as well as factual understanding of the proceedings against him.'" *United States v. Miller*, 531 F.3d 340, 350 (6th Cir. 2008) (citation omitted). For a reasonable attorney to recognize these "indicia of incompetence," then, he must perceive more than a general concern about his client's mental health. *See, e.g., United States v. Davis,* 93 F.3d 1286, 1290 (6th Cir. 1996) ("[I]t does not follow that because a person is mentally ill he is not competent to stand trial.") (internal quotations and citation omitted). Instead, counsel must have access to evidence that would give him "reason to doubt" his client's basic ability to "understand the proceedings, communicate with counsel, and assist in his own defense." *Jermyn,* 266 F.3d at 300.

At the evidentiary hearing, Gordon indicated that there was nothing about Cobb's "discussion with [him], his mannerisms, his physicality, anything at all that suggested . . . there [might] be an issue of competency." [R. 196 at 43.] He testified that Cobb "was very, very involved in his case," and "very involved in attempting to prove his innocence." [*Id.* at 43-44.] Gordon also recalled that Cobb "would always come up throughout the preparation of the trial with issues that he felt needed to be discussed," after which Gordon "would make the trek down [to see Cobb] . . . to discuss it with him." [*Id.*] And he likewise stated that he never received "any information . . . from any other source that made [him] doubt [Cobb's] competency."[8] [*Id.*]

---

[8] Cobb did testify that he told Gordon about being placed in a "medical ward" for "[h]eart trouble" and "panic attacks" sometime before his trial, and that he had experienced "nightmares" and "flashbacks" from a car accident he was in several years before. [R. 196 at 66.] But this information falls far short of suggesting that Cobb lacked a basic ability to understand the proceedings against him or assist in his defense.

13

In his previous affidavit, Gordon also remembered that "Cobb was always very engaging with [him], asked appropriate questions, and exhibited complete understanding of the crime he was alleged to have committed." [R. 124-1 at 1.]

The Government argues that Gordon's personal observations, standing alone, were sufficient to determine Cobb's competence. It proposes that, "[w]hatever [the circumstances triggering the need for investigation] may be, at the very least they must include counsel's personal observation of sufficient indicia of" his client's incompetence. [R. 195 at 6.] The Court disagrees. In attempting to evaluate a criminal defendant's mental health, the defendant's "demeanor is not dispositive." *Bouchillon v. Collins*, 907 F.2d 589, 593–95 (5th Cir. 1990). And that is true for an intuitive reason: all forms of mental illness will "not necessarily be obvious to the layman." *Id.* To permit an attorney with no medical training to make a unilateral determination about his client's mental health—even when other evidence indicates the defendant may be suffering from a severe mental illness—would carry self-evident and unacceptable risks. That is why, when an attorney receives sufficient indicia of incompetence, he "is not entitled to rely on his own belief about a defendant's mental condition, but instead must make a reasonable investigation." *Becton v. Barnett*, 920 F.2d 1190, 1191 (4th Cir. 1990).

The question, then, is not whether Gordon's personal observations of Cobb supplied enough indicia of incompetence to warrant an investigation. The question is whether *all* the evidence available to counsel, including his own observations, triggered a duty to investigate. In answering this question, courts have generally required very strong evidence of a defendant's debilitating mental illness. In *Becton*, for example, the defendant had recently been "involuntarily committed . . . for being delusional and paranoid," had "auditory hallucinations and thought that he was an Army Captain," and specifically told his attorney that he "had been in

14

and out of mental hospitals prior to his arrest." *Id* at 1190-91.  Here, by contrast, Gordon had only some documentary evidence of self-reported diagnoses from many years before Cobb's arrest.  This evidence—including alleged diagnoses of bipolar disorder and schizophrenia—was certainly concerning.  But no one—not Gordon, the Court, or any other individual present at Gordon's trial—observed or reported any signs that Cobb was suffering from mental illness, much less that he was unable to understand the nature of the proceedings against him or assist in his defense.

Given that (1) Cobb's alleged mental health diagnoses occurred years before his offense conduct, (2) no evidence signaled any recent mental health issues that would call his competency into question, and (3) his behavior at trial revealed no causes for concern, the Court finds that Gordon's decision not to investigate Cobb's mental health was probably not objectively unreasonable.  But more importantly, the reasonableness of Gordon's performance is not dispositive.  The final "purpose in examining any claim of ineffective assistance of counsel is to ensure that the defendant was accorded due process, not to grade counsel's performance." *Bouchillon*, 907 F.2d at 595 (internal quotations and citation omitted).  Even if Gordon's representation was deficient, Cobb is still not entitled to a new trial unless "there is a reasonable probability that, but for counsel's [failure to request a competency evaluation prior to or during trial], the result of the proceeding would have been different." *United States v. Dubrule*, 822 F.3d 866, 881 (6th Cir. 2016).

The facts established at the evidentiary hearing suggest that Gordon's failure to request a competency evaluation had no impact on the outcome of Cobb's trial.  When asked about his alleged diagnoses of bipolar disorder and schizophrenia, Cobb testified that he "received treatment" for these illnesses beginning in 2003, that he saw a doctor "every month" from 2003

15

to the date of his trial, and that he routinely took "medications" for these issues throughout that same time period. [*Id.* at 59, 72.] He also expressly affirmed that, "when [he was] arrested and detained," he understood he was being prosecuted for "[d]istribution" of "OxyContin." [*Id.* at 60.] And when asked what he understood he was "facing as far as prison time if [he] was convicted of that," Cobb responded that some counts were for "five year[s]" and others for "20," and confirmed that he understood "some of the counts had different . . . periods of incarceration." [*Id.*]

Cobb also freely admitted that he participated in the preparation of his defense. He stated that he would frequently ask Gordon "about [his] case," and that he wrote down and gave Gordon a long list of women who could testify at his trial. [*Id.* at 61.] And he recalled that he spoke to Gordon "several times" about the alleged audio tapes that he believed would bolster his defense. [*Id.* at 62.] Cobb's sister likewise remembered Cobb writing down "questions [about the case] . . . that he would give to [her and] that [she] would give to [Gordon]."[9] [*Id.* at 22.]

All of this testimony is consistent with Gordon's assessment that Cobb was "very involved in attempting to prove his innocence" and "exhibited complete understanding of the crime he was alleged to have committed." [*Id.* at 43-44, R. 124-1 at 1.] And none of this testimony is consistent with the claim that he actually lacked "a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding'" and/or "a rational as

---

[9] Cobb's sister did claim that he had been "proven incompetent" years before his trial. [R. 196 at 23.] But this was merely a reference to the "State of Kentucky" allegedly declaring him "disabled" due to the diagnoses noted above. A declaration of disability is not proof of incompetence. And when Cobb's sister testified specifically about Cobb's understanding of the proceedings against him, she said only that Cobb "had an understanding that he was incarcerated, but maybe he didn't realize the depth that – how the other side was going and what it all entailed." [*Id.* at 18.] Defendants will frequently fail to "realize the depth" of "how the other side [is] going," including many defendants who have no mental illness of any kind. That is not the standard for proving incompetence.

16

well as factual understanding of the proceedings against him.'" *Miller*, 531 F.3d at 350. Cobb's own testimony, combined with all the other testimony and evidence presented at the hearing, strongly establishes that he understood the nature of the proceedings against him and actively participated in his defense. The Court thus finds that, even if Gordon had requested a competency evaluation, this request would not have affected the outcome of Cobb's trial.

Any investigation of Cobb's mental health also would not have impacted the guilt phase of his trial. To the extent that Cobb claims these alleged diagnoses would have supported an insanity defense, the Court notes that "insanity defenses are rarely successful in the best of circumstances." *Forsyth v. Ault*, 537 F.3d 887, 893 (8th Cir. 2008); *see also United States v. Torniero*, 570 F. Supp. 721, 727 (D. Conn. 1983), *aff'd,* 735 F.2d 725 (2d Cir. 1984) ("[D]espite its notoriety, the insanity defense is rarely asserted and even more rarely successful."). This unusual claim requires evidence that, "at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17(a). Even when a defendant offers some evidence to support this defense, acquittal on this basis is unlikely. *Cf. United States v. Clark*, 294 F.3d 791, 793–94 (6th Cir. 2002) (finding jury reasonably rejected insanity defense even though defendant had "chronic paranoid schizophrenia" and reported "voices telling him" to commit the crime, where expert found no other clear evidence of "psychosis at the time of the [offense]" and defendant suggested "he was usually able to ignore" the voices).

Here, Cobb apparently believes that the mere *fact* of his previous diagnoses, without more, would be enough to advance this defense. It would not. Even Cobb admits that he was on extensive medication throughout the time period in question, and that he visited a doctor "[e]very

17

month." [R. 196 at 59, 71-72.] He presents no evidence to suggest that he was actually "unable to appreciate the nature and quality of the wrongfulness of his acts" at the time of the offense. 18 U.S.C. § 17(a). The Court finds no "reasonable probability" that a defense premised on this claim would have succeeded. *Strickland,* 466 U.S. at 694.

The same analysis applies to the penalty phase of Cobb's prosecution. The Court easily finds that Cobb would not have received a reduced sentence if counsel had raised the issue of his prior diagnoses at sentencing. As the above discussion demonstrates, there is no indication that these alleged illnesses had any impact on Cobb's offense conduct. And even if the Court had determined that those illnesses contributed to that conduct, this recognition would not have necessarily resulted in a reduced sentence. *See, e.g., United States v. Villa-Gomez*, 193 F. App'x 586, 591 (6th Cir. 2006) (finding that district court acted "reasonably and within its discretion" in concluding that "greater incarceration was needed because [the defendant's] mental health problems presented the possibility of recidivism," and thus "[a] longer period of incarceration would protect both him and society.").[10]

The Court adds, too, that it was aware of these diagnoses prior to Cobb's sentencing. The Probation Office expressly incorporated Cobb's description of his mental health history into the Presentence Investigation Report, and the Court adopted those findings at sentencing. [*See* PSR at 20.] Counsel's discussion of this issue would have merely re-emphasized what the Court already knew, and would not have affected the outcome. *See Smith v. Mitchell,* 348 F.3d 177,

---

[10] Cobb attempts to argue that, if "counsel had introduced evidence of [his] mental disability and argued the evidence in mitigation, it is possible that the jury would have found [him] innocent." [R. 145 at 5.] Cobb is confusing the guilt phase of trial with the penalty phase. The case cited by Cobb to support this claim, *Williams v. Taylor,* 539 U.S. 362 (2000), concerned a defendant's challenge to a death sentence. The *Williams* Court found that, if counsel had presented substantial mitigating evidence of the defendant's mental impairments to the "sentencing jury," there was "a reasonable probability" his client would not have received the death penalty. *Id.* at 390-391. *Williams* had nothing to do with the guilt phase of trial, and is irrelevant to the Court's analysis.

202 (6th Cir. 2003) (finding no prejudice where mitigating evidence presented on post-conviction review was "merely cumulative" of information already available to sentencing panel).

### C

The Court ends by noting that, about six months after the Magistrate submitted his recommendation, Cobb filed a motion to supplement his motion to vacate. [R. 148.] This motion resurrects his claim that (1) trial counsel rendered ineffective assistance by failing to move for the suppression of evidence obtained from Cobb's cell phone, and (2) appellate counsel also rendered ineffective assistance by failing to raise this issue on appeal. [*Id.* at 1-4.] The Magistrate already addressed this argument in his report. [R. 143 at 15-18.] Petitioners have only fourteen days to object to a Magistrate's recommendation. Fed. R. Civ. P. 72(b)(2). Cobb cannot circumvent this rule by styling his petition as a "motion to supplement."

In any event, the only new case cited by Cobb in support of this motion, *Riley v. California*, 134 S. Ct. 2473 (2014), is facially inapplicable to the facts at issue here. The *Riley* Court held in 2014 that the "*warrantless* search of an arrestee's cell phone" may violate the Fourth Amendment. *Id.* at 2492 (emphasis added); *see also United States v. Blackwell,* 636 F. App'x 668, 673 (6th Cir. 2016) (noting that *Riley* only applies to warrantless searches). The police had a valid warrant here. [R. 143 at 15-18.] And the Court also notes that (1) *Riley* does not apply retroactively and (2) counsel could not have filed a motion to suppress in 2008 or 2009 on the basis of an opinion issued in 2014. *See, e.g., Hart v. Quintana,* 2015 WL 8770077, at *4 (E.D. Ky. Dec. 14, 2015) (explaining that *Riley* does not apply retroactively).

19

### III

For the reasons explained above, the Court finds that Cobb's claims are meritless. The Court also holds that "reasonable jurists" would not "find the district court's assessment of [his claims] debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, the Court **HEREBY ORDERS** as follows:

(1) With the exception of those issues discussed at DE 152, the Magistrate's Report and Recommendation **[R. 143]** is **ADOPTED** as and for the opinion of the Court;

(2) Cobb's Motion to Strike a Portion of his Reply **[R. 135]** is **GRANTED;**

(3) Cobb's Motion to Vacate **[R. 106]** and Amended Motion to Vacate **[R. 130]** are **DENIED**;

(4) Cobb's Motion for Recusal **[R. 122]** is **DENIED**;

(5) Cobb's remaining motions for discovery **[R. 131; 133; 134; 136]** are **DENIED;**

(6) Cobb's Motion to Supplement **[R. 142]** is **DENIED**;

(7) Cobb's second Motion to Supplement **[R. 148]** is also **DENIED**;

(8) A Certificate of Appealability is **DENIED**; and

(9) Judgment shall be entered contemporaneously herewith.

This 25th day of August, 2016.

Gregory F. Van Tatenhove
United States District Judge